1

```
              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
                    ORLANDO DIVISION


- - - - - - - - - - - - - - - X
WYNDHAM VACATION OWNERSHIP, INC.,    :
et al.,
                                     : Case No.:
      Plaintiffs,                    : 6:19-cv-476-GAP-EJK
                                     :
                                     : Orlando, Florida
vs.                                  : April 20, 2021
                                     : 1:30 p.m.
                                     :
CHARLES E. GALLAGHER, et al.         :
                                     :
      Defendant.                     :
- - - - - - - - - - - - - - - X

         TRANSCRIPT OF MOTIONS HEARING (DOC 190)
          BEFORE THE HONORABLE EMBRY J. KIDD
             UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

Counsel for Plaintiffs:     Benjamin Travis Brown and
                            Michael J. Quinn
                            Shutts & Bowen LLP
                            300 S. Orange Ave., Suite 1600
                            Orlando, FL 32801

Pro Se Defendant:           Charles E. Gallagher
                            329 Serina Cove
                            Destin, FL 32541


Proceedings recorded by digital recording.
Transcript produced by computer-aided transcription.


Court Reporter:  Suzanne L. Trimble, CCR, CRR, RPR
                 Federal Official Court Reporter
                 401 West Central Boulevard, Suite 4600
                 Orlando, Florida 32801
                 e-mail: trimblecourtreporter@gmail.com
```

2

1                    T A B L E   O F   C O N T E N T S

2

3
     PROCEEDINGS                                              PAGE
4

5
                           April 20, 2021
6

7

8    Colloquy Re: Motion to Compel
     RFP Nos. 1-6, 10, 13, and 16...........................3
9    Colloquy Re: Motion to Compel RFP No. 11,
     Retainer Agreements..................................23
10   Colloquy Re: Motion to Compel RFP No. 7,
     Privilege Log........................................25
11   Colloquy Re: Motion to Compel Owner List.............27
     Colloquy Re: Request For Sanctions...................28
12   Colloquy Re: Service to Mr. Gallagher................28
     Colloquy Re: Timing of 30(b)(6) Deposition and
13   Document Production..................................31

14

15

16

17

18

19

20

21

22

23

24

25

3

1              P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Court is now in session.  The

3    Honorable Embry J. Kidd presiding.

4       Case No. 6:19-cv-476, Wyndham Vacation Ownership, Inc., et

5    al v. Charles E. Gallagher, et al.

6       Counsel, please state your appearances for the record,

7    starting with Plaintiffs.

8          MR. BROWN:  Travis Brown from Shutts & Bowen for the

9    Plaintiffs.

10          MR. QUINN:  Michael Quinn also with the Plaintiffs.

11          MR. GALLAGHER:  Charles Gallagher for the defendant.

12          THE COURT:  All right.  Good afternoon, everyone.

13      We're here on Plaintiffs' motion to compel.  I've read the

14   motion, as well as the response.  It seems, at least as to some

15   of the issues, the answer from Mr. Gallagher is that the

16   documents don't exist.  It seems that that was his response to

17   the -- to the document request, as well as in response to the

18   motion.

19      Do Plaintiffs have anything to add as to those responses?

20          MR. BROWN:  We do, Your Honor, and Travis Brown here

21   for the Plaintiffs.  The Plaintiffs contend here, Your Honor,

22   that Mr. Gallagher's written responses, as well as his response

23   to this motion, show that he has actually not undertaken a good

24   faith effort to search for documents, and I would like to point

25   the Court to a few examples.

4

1      The first is, if the Court looks at the responses to Request

2   For Production 1 through 6, 13, and 15, they all generally state

3   that Mr. Gallagher doesn't believe that documents exist or he's

4   not sure if documents exist, and, therefore, they're not in his

5   possession, custody, or control.  But request 8 through 12 say,

6   well, no documents exist.  And so there's clearly a distinction

7   here between what those two responses state.

8      In addition, for Request For Production No. 2, which deals

9   with payment information from defendants Paul Stewart and

10   Gallagher-Clifton to Mr. Gallagher, he states that he has no

11   responsive documents.  Yet, in his answer to Interrogatory No. 4

12   says that he was actually paid by these individuals.  So unless,

13   you know, Mr. Gallagher was getting paid in cash somehow, there

14   would have to be some kind of record of these transactions,

15   whether they be bank records or other documentation.  And so it

16   just seems quite inconsistent that in one response he says, Yes,

17   I was paid and in the other, I don't have any information.

18      In response to Interrogatory No. 10, he identifies two bank

19   accounts, but it's unclear whether those have been searched for

20   responsive records.

21      In addition, Requests 4 and 5 ask for communications and

22   information related to referrals of timeshare owners to him by a

23   company called Vacation Select Services and its owner Paul

24   Bonds, and in response to those he says he has no documents.

25   Yet, there were two different -- there are two different things

1    that show this is likely not the case.

2         First, his response to Interrogatory No. 7 and 11 admit that

3    he actually did receive owners as referrals from these entities

4    and that he represented some of them.  And in response to the

5    motion we're here regarding today he says, Well, now he's going

6    to look -- start looking for responsive documents, but his

7    systems are antiquated, or he's unsure if he can -- he can find

8    them.  So his answer has changed from, I don't have anything or

9    there is nothing to now I'll go look for them.  And what that

10   leads us to believe is that really a good faith search hasn't

11   been done in the first instance.  In some of the other requests

12   he says he needs more time to look for documents.  And we

13   haven't received one piece of paper from Mr. Gallagher in

14   response to any of this discovery.

15        And, finally, I'll note, Your Honor, this is our second trip

16   before the Court on these particular discovery requests.  At

17   first they weren't answered at all, and after the Court entered

18   an order, there were some belated answers, but we still don't

19   have any of this information.

20        And so we have, you know, significant concerns that

21   Mr. Gallagher hasn't really done a search here of his e-mail

22   account.  We know he uses a Gmail account.  He told us he uses a

23   Gmail account.  We don't think that there's been a search for

24   bank records or other -- I guess, other third-party sources

25   that, I mean, he might not have on his computer right in front

6

1    of him, but he has the legal authority to obtain records from,

2    which that's the standard for control in the Eleventh Circuit.

3    It's not, you know, just what's on his laptop right in front of

4    him but what he has the legal ability to obtain.  And this

5    information is crucial to Wyndham's case.

6         So with that, Your Honor, I realize that's a long answer to

7    your question, but that's some of the instances where we believe

8    his responses are inconsistent on that -- on that front.

9              THE COURT:  All right.  Mr. Gallagher, what's your

10   response?

11             MR. GALLAGHER:  Your Honor, initially, first of all, I

12   apologize that initially I did not respond to their motion a

13   couple of months ago.  That was pure ignorance on my fault -- my

14   behalf.  I didn't realize about local order that gave such a

15   very short time in which to respond.  I'm not as familiar with

16   the procedures in federal court as I -- as I should be, and for

17   that I apologize to the Court, and I'm taking my medicine for

18   it.

19        In this instance -- well, and the reason I did not respond

20   initially to their discovery is because Wyndham and I were in

21   settlement talks, and we would be discussing settlement one day,

22   and the next day I'm getting motions to compel and things, which

23   Mr. Quinn admitted it's because there are four or five people on

24   their team dealing with me, and they may be doing different

25   things at different times.  So I apologize to the Court that

1   initially I may not have been responsive to their discovery.

2       Since then, I took it very seriously, Your Honor.  However,

3   these Wyndham cases, I've inherited most of them.  They were not

4   mine.  They belonged to an exit company that did not keep very

5   good records.  And I just don't have some of the stuff they've

6   requested.

7       As far as old bank records, they're asking for records from

8   three years ago when I was sometimes paid to review documents on

9   behalf of an exit company.  I didn't even represent owners back

10  then.  And usually once a month or once every two months or

11  whatever, I would receive a check for a nominal amount, that

12  going through my six or seven bank accounts -- nowadays the

13  banks don't even send you copies of checks normally.  You know,

14  A, if I thought -- you know, A, they're not relevant to

15  anything.  I admit years ago I would review some documents for

16  an exit company.  I did not enter appearances with the court for

17  any reason.  I did not represent clients.  And now and then I

18  would get a check for a nominal amount, which I did look at and

19  I was unable to identify.

20      Your Honor, rather than be here before the Court, if I had

21  documents that were requested, I would produce them.  As a

22  matter of fact, in this case, Your Honor, after I initially

23  responded to their discovery and I had a discussion with

24  Mr. Quinn that some of my discovery responses may have been

25  lacking, I went back through and amended anything I possibly

1    could amend.  They have received amended discovery responses

2    from me, but in many instances, the way they've requested

3    documents, I just don't have responsive documents, and I have no

4    way of creating them.  I don't know what to tell them.

5        If I had documents -- there was one request, No. 6, that

6    when Mr. Quinn and I were having a discussion a week or two ago

7    and I was rereading it.  I acknowledged to him, I said, You

8    know, I read this differently when I responded.  I said, Reading

9    this now, please allow me to go back and see, now that I'm

10   looking at it a different way, if I can identify any responsive

11   documents.  That was the other one -- the only one.  As far as

12   requests 1 through 6, I don't have them.  I have made diligent

13   search.

14       They're picking on my wording because I may have said, I'm

15   not aware of their existence or versus they don't exist or

16   whatever.  Your Honor, I meant the same thing, regardless of

17   which way I worded it.  Most of the documents they requested

18   from me simply do not exist.  Again, I inherited these cases,

19   and I did not inherit files with them.

20       I inherited them from a timeshare exit company that was

21   going out of business, and they were leaving these owners high

22   and dry, without giving them any type of refund or whatever.  I

23   was semi-retired, and I said, You know what, just send me their

24   names and let me see if I can't help these people.  I did not

25   charge the people anything extra.  I'm doing my best to help

1  them gratuitously, Your Honor.

2      But I just simply don't have some of the documents they've

3  requested, and I honestly am unaware of their existence.  I

4  don't know what else I can do.  I've responded twice to the same

5  discovery, looking at it very carefully, and I just simply don't

6  know of the existence of most of the documents they've

7  requested.  I don't even know where to get the documents because

8  my predecessor in these cases, VSS from what I understand, is

9  basically out of business.  They were leaving these clients high

10  and dry.

11      I don't -- I have no source of documents that were dealt

12  with previous to my involvement, Your Honor.  The documents I

13  have are what I could get from my clients and the documents that

14  I have generated and I have sent to Wyndham.  I looked twice at

15  this discovery, Your Honor.  You can ask Mr. Quinn if we didn't

16  have that discussion.  And most of the documents they've

17  requested honestly are not within my possession, custody, or

18  control, and I have reconsidered every single request.  I simply

19  don't know what else I can do.

20          THE COURT:  All right.  So as far as your responses

21  and the differences between -- say, your responses to 1 through

22  6, where you say no responsive documents are found within the

23  possession, custody, or control of this defendant, you don't

24  mean that to be a different answer from your responses to, for

25  instance, 8 through 12 where you say no such documents are known

1    to exist?

2            MR. GALLAGHER:  No, Your Honor.

3            THE COURT:  You mean those to be the same answer?

4            MR. GALLAGHER:  I meant for them to be the same, Your

5    Honor.  I apologize if I worded the answer differently.  I was

6    sitting there one night dictating, and I apologize if the

7    answers -- if the verbiage slightly differed, but I honestly

8    could not find any of the requested documents within my

9    possession.  Now, they can contact ex-owners of companies such

10   as VSS or Mr. Paul Stewart, who used to be a party to their

11   lawsuit who doesn't work for me.  They may have responsive

12   documents, but I simply do not.

13       And in some cases, I actually asked those people myself.  I

14   tracked them down and asked if they had responsive documents,

15   and they simply were not real forthcoming or cooperative.  I

16   just don't have them, Your Honor, no matter how --

17           THE COURT:  As to the financial information, you

18   mention that the bank only retained the documents for a certain

19   period of time.  Is that based on your review online, or did you

20   contact the bank to see if there were additional records that

21   weren't available to you online?

22           MR. GALLAGHER:  Well, I contacted the bank, Your

23   Honor, because after a while they are no longer available, and I

24   no longer deal with Wells Fargo bank, number one.  I asked the

25   bank manager.  He made it sound like it would be a huge project

1    to go back and somehow recreate -- that his office could not do

2    it, you know, which I don't mind paying the bank to do it.  But,

3    you know, he would be going back looking for records from three

4    years ago with deposits of maybe $2,000 that were not identified

5    specifically, and I would be going back frankly guessing what

6    deposits were what.  They're asking for payments that were

7    made if I took a look at a document and explain it to one of

8    their -- to one of my former clients, if I said, Look, this

9    simply says, you know, that they're taking -- they're going to

10   foreclose on the person's points.  I told them one time what "in

11   rem" meant, and he was so proud he used it for months.  But I

12   get maybe $50, 35 or $50 for answering that question.  I

13   never -- I never went to court for them.  I never entered an

14   appearance in any matter.  And I never entered an appearance for

15   any of their owner clients of Wyndham.

16        So if they want me to go back and guess at, oh my gosh, here

17   I made a deposit of, you know, $1,300 for the month, I can't

18   figure out what that was for, maybe it was for them and list

19   that, but that's not even probative of anything, Your Honor,

20   number one.  And, number two, the responses are not going to be

21   accurate.

22            THE COURT:  All right.

23            MR. GALLAGHER:  I mean, we're talking three years ago.

24            THE COURT:  So if the Plaintiffs were then to cut a

25   subpoena to Wells Fargo, I assume you wouldn't then claim that

1   that's somehow harassing or anything like that?

2           MR. GALLAGHER:  No, Your Honor.  If they want to

3   subpoena Wells Fargo -- in fact, Your Honor, if it's that

4   important to them, if you will allow me time for Wells Fargo to

5   come up with them, I will go to Wells Fargo today, and I will

6   tell them whatever it costs I'll pay the cost.  Can they please

7   find all of my bank statements from back three years ago.  And I

8   will supply them to them.  I just honestly didn't realize it was

9   probative of anything, number one.  And number two, the guy at

10  the bank made it sound like an almost impossible task, but, Your

11  Honor, you have my word, I will go today to the branch, and I

12  will request those records.

13          THE COURT:  I'll put it to the Plaintiffs.  How far do

14  you want to go with this?  Do you want to take Mr. Gallagher at

15  his word that he doesn't have these documents, or would you like

16  him to get them from Wells Fargo or would you like to cut a

17  subpoena to Wells Fargo?  What would the Plaintiffs propose?

18          MR. QUINN:  Your Honor, this is Michael Quinn.  If I

19  could just address that.  So I may have misheard him.  But I

20  thought he had indicated a moment ago that he had already gone

21  to the bank to ask for this information.  Now he's saying he's

22  going to go to the bank to ask for this information.

23          THE COURT:  My understanding is that he went to the

24  bank, and the bank said that it would not be an easy process,

25  and he left it at that.

13

1          MR. QUINN:  Okay.  Well, we would -- we would request

2     that he would go to the bank and attempt to obtain those records

3     or identify the accounts at issue.

4          The other point, and to be honest, the bank records are not

5     as concerning to me because that is something that we could do a

6     third-party subpoena for, for instance, and try to obtain the

7     information that way.  Some of these other requests, 1 through

8     6, deal with topics that we have a harder time obtaining.

9          In particular, 5 and 6 deal with -- actually, 4 through 6

10    deal with e-mail communications between Mr. Gallagher and these

11    exit companies that he said that he took over cases for,

12    including a man by the name of Paul Bonds.  When I took

13    Mr. Gallagher's deposition last year, Mr. Gallagher testified

14    that there were Gallagher Law Firm offices operating out of

15    Nevada and New Jersey, despite the fact that Mr. Gallagher is

16    not licensed to practice law in either of those two states, and

17    he was unable to provide me with any of the names of any of the

18    employees that work out of those offices.  And so it's our

19    belief that these Gallagher Law Firm offices are actually being

20    run by this nonlawyer, Mr. Paul Bonds.  And to date, despite

21    these requests, we haven't received a single e-mail between

22    Mr. Gallagher and Mr. Bonds or anyone else in these Nevada or

23    New Jersey offices that supposedly are Mr. Gallagher's offices.

24         So I don't think that there's been any search of his e-mail

25    accounts with respect to those requests 4 through 6.  My

1    understanding is he's indicated that his systems are antiquated,

2    and it's difficult for him to search the e-mail accounts, but I

3    think that's the issue.

4        When we had the meet and confer last week prior to the

5    hearing and we addressed this issue, it's my understanding that

6    Mr. Gallagher continues to have communications with Mr. Bonds,

7    but there's really been no explanation either in his response to

8    the motion to compel or here as to why there's been no search

9    and production of any of those e-mails.

10            THE COURT:  All right.  Mr. Gallagher, have you

11    searched your e-mail for these communications?

12            MR. GALLAGHER:  Yes, Your Honor.  First of all, I

13    think my previous responses have been misconstrued.  There are

14    offices -- or there were.  They are shut down now, Your Honor,

15    or in the process of being shut down because it simply was too

16    much of a hassle to try to deal with.  But there were offices

17    that they were folks who were good at identifying potential

18    clients and -- identifying potential clients and communicating

19    with those clients.  So they were independent contractors who

20    simply would refer cases to our firm, much like some of these

21    legal services do, Your Honor.  They weren't full-blown offices

22    on my behalf.  I honestly couldn't give you the name of anybody

23    who worked at those offices, but they simply would send us

24    cases.

25        We don't practice in those states.  If I do have a potential

1    case in those states, like I do in Florida from time to time, I

2    petition the Court to allow me to appear by virtue of local

3    counsel.  I do it properly, Your Honor.  I've handled appeals in

4    cases in the state of Florida where I'm not licensed, but I

5    follow the protocol.

6        I am not precluded from talking to potential clients in

7    those states and especially when I've never even sent Wyndham a

8    threatening letter on behalf of any client outside of Georgia.

9    I may have put Wyndham on notice that we heard from someone who

10   may have a potential issue and would they like to address it,

11   but if it involved the practice of law, Your Honor, local

12   counsel would be involved.

13       I looked back.  Most, if not all, communications with

14   Mr. Bonds -- I apologize that I'm old school -- are primarily by

15   telephone or were by telephone.  I don't even talk to the

16   gentleman anymore.  But to me it's much easier to pick up the

17   phone and say, Hey, I have a problem with this, what is the

18   situation, rather than be doing 20 e-mails back and forth, which

19   I've seen people do, and that could be why I couldn't identify

20   e-mails, Your Honor.  I pick up the phone.

21             THE COURT:  But so to clarify, did you search your

22   e-mail?

23             MR. GALLAGHER:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MR. GALLAGHER:  Yes, I did.  And I don't -- I've

1  rarely communicated with Mr. Bonds in my life, and I pick up the

2  telephone because to me a quick conversation is so much more

3  efficient.

4  THE COURT: All right. So it sounds like

5  Mr. Gallagher stated on the record that he did search the e-mail

6  for responsive documents.

7  MR. GALLAGHER: I did, Your Honor.

8  MR. QUINN: And to that point, even if there's no --

9  so I want to be clear that Mr. Gallagher is stating here today

10  that there are no e-mails between himself and Mr. Bonds.

11  MR. GALLAGHER: I'm not aware of any.

12  THE COURT: And then additionally, that even though

13  there are hundreds of Wyndham clients that would have been

14  referred to Mr. Gallagher from these offices in New Jersey and

15  Nevada, that it's his statement here today that there's no

16  e-mails reflecting the referral or transmission of any of those

17  client files.

18  MR. GALLAGHER: No, I did not say that.

19  THE COURT: There are no e-mails -- go ahead.

20  MR. GALLAGHER: Sometimes, Your Honor, if a client is

21  referred, somebody will send me possibly a text message saying,

22  This client would like to talk with you, is there a good time

23  for them to communicate with you, or can they communicate with

24  you at 7:00, and I may text back, Yes. I mean, so, yes,

25  occasionally if they're referring a client to me, but that

1  wouldn't have been Mr. Bonds, but if anyone was referring a

2  client to me, oftentimes I would get a text message, Is it okay

3  for a potential client to contact you at seven this evening?

4  And I would respond, I'm sure, by saying yes or no.  I mean, I'm

5  not saying that they never -- in referring clients I never got

6  any type of communication.  They just wouldn't have been from

7  Mr. Bonds.

8           MR. QUINN:  All right.  So, Your Honor, he's admitted

9  that there are communications that would be responsive to these

10 requests.  Only one of these requests is related to Mr. Bonds.

11 There's numerous other requests asking for the communications

12 with VSS or with other, other entities.  No. 15, it says,

13 Communications between you and any other entity which discussed

14 solicitation of Wyndham owners for timeshare services.

15     Our request is also -- we use the word "communications" as a

16 defined termed.  It not only includes e-mails.  It also would

17 include -- I believe it would include text messages.  I would

18 have to look back and confirm that.  But usually all of our

19 standard requests include that.

20     So with that, Your Honor, our request would be that he go

21 back, with respect to the bank records as we previously

22 discussed, and further that there be -- in light of the fact

23 that there's already an order compelling the production and that

24 we're now here on the second motion to compel, that

25 Mr. Gallagher allow a third-party vendor to obtain the e-mail

18

1   records in order for there to be a full search of that database.

2       THE COURT:  Well, so far I've heard about text

3   messages that were exchanged.  So certainly Mr. Gallagher should

4   produce any text messages that are in his possession.

5       MR. GALLAGHER:  I will do that, Your Honor.

6       THE COURT:  I haven't heard anything -- so with regard

7   to e-mails -- so you said you received text messages.  Did you

8   also receive e-mails?

9       MR. GALLAGHER:  No, Your Honor.  And, Your Honor,

10  despite what they're asking, if I turned over my communications,

11  that would include a lot of privileged material.

12      THE COURT:  All right.  Well, I'm not going to

13  order --

14      MR. GALLAGHER:  And the document --

15      THE COURT:  I'm not going to order a third-party

16  vendor to review your text messages at this point, but I do -- I

17  do want to emphasize that you should make a -- conduct a

18  thorough review of your text messages, including those that --

19  you know, there are some text messages that are stored on your

20  phone.  There might be some that are stored in the cloud

21  somewhere.  If you have an iPhone, it might be on iCloud.  It

22  might be -- if you use SMS text messages, they might be in the

23  possession of your -- of your telephone company, whichever you

24  use.  So I do want to make sure that you engage in a thorough

25  search for those.

1          MR. GALLAGHER:  Yes, Your Honor.

2          THE COURT:  All right.

3          MR. QUINN:  Your Honor, one other point on this and I

4    hesitate to bring this issue up, but I think I have an

5    obligation to do so.  When Mr. Brown and I conferred with

6    Mr. Gallagher last week in preparation for this hearing and we

7    went over some of these issues regarding the fact that somehow,

8    despite the fact that he has hundreds of clients, he can't

9    produce a single e-mail transmitting any of those clients'

10   information or files, Mr. Gallagher stated to us that Paul Bonds

11   is currently threatening him.  And my concern is that some of

12   the responses that we're getting today and the fact that no

13   documents, no e-mails whatsoever, text messages with Mr. Bonds,

14   e-mails with Mr. Bonds, et cetera, have been produced is that

15   Mr. Gallagher might be under some sort of threat of physical

16   violence, and I bring that to your attention.  Mr. Brown will

17   vouch for it, that we were there at the call last week where

18   that was stated.

19       In addition, the context of all of this is that we have been

20   attempting to take the corporate rep deposition of the Gallagher

21   firm based upon the fact that Mr. Gallagher himself couldn't

22   testify as to who these employees were in these offices, et

23   cetera.  And that was supposed to take place this past week and

24   did not go forward.  We had an issue -- or, you know, whatever

25   the issue was, Mr. Gallagher was unable to attend the Zoom

1   deposition, and we're trying to reschedule it at this point.

2   But I think that what's relevant, as well, is that everyone is

3   aware that we're trying to take this Gallagher firm deposition,

4   and to date we've received zero documents related to

5   Mr. Gallagher or his law firm.

6        But on this issue of the physical threat, it's my

7   understanding Mr. Bonds is out there in Las Vegas, that he is

8   the one who is operating this Gallagher firm office that

9   Mr. Gallagher says he's now going to try to shut down.  But like

10  I said, Your Honor, I think that's something that needs to be

11  weighed here.  I understand Your Honor's decision not to -- or

12  inclination, at least at this point, not to order a vendor to do

13  a search, but I think under the circumstances of what we've been

14  told is that I just don't think it's sufficient for

15  Mr. Gallagher to say that there's no documents that exist under

16  these circumstances.

17             MR. GALLAGHER:  Your Honor, I'm not being threatened

18  by anybody.  I don't know what comment they picked up on that

19  was misunderstood, but no one is physically threatening me, Your

20  Honor.  I've been practicing law for 35 years.  And nobody, no

21  Mr. Bonds or anybody, is going to tell me what I can produce and

22  cannot produce for this court.  That's just ludicrous, number

23  one.

24        Number two, Mr. Bonds and I aren't communicating these days

25  because due to Wyndham's request in our exploration of

1    settlement I have been in the process of totally shutting down

2    anything I had to do with Las Vegas and Atlantic City, and yet

3    now they're using that against me.  I don't understand.  I'm

4    shutting down those offices because I don't need people there.

5    I can have people in Georgia do the same exact thing.  I just --

6    and it bothered Wyndham.  So I have no problem shutting down

7    those offices.  If now it's become a problem that I'm doing so,

8    they can tell me, and I'll keep the offices open.  But they

9    don't get it both ways.  Wyndham asked me to shut those offices

10   down.  They said -- Mr. Quinn and I have had an excellent

11   relationship throughout this litigation.  He indicated that, A,

12   that would go a long way, and, B, if Wyndham and I ultimately

13   reached a settlement, that that would be part of the settlement.

14   So I've had no problem doing that, Your Honor.  But nobody has

15   threatened me, and I'm not afraid of anybody.  That's just

16   ludicrous.

17              THE COURT:  Well, I'm not going to --

18              MR. BROWN:  If I could --

19              THE COURT:  Go ahead, Mr. Brown.

20              MR. BROWN:  I'm sorry, Your Honor.  I just wanted to

21   add two things for the Court's consideration.  One is, I can

22   vouch for the conversation between Mr. Quinn and Mr. Gallagher,

23   and I believe Mr. Quinn asked him that question directly, and

24   Mr. Gallagher confirmed that that was the case regarding the

25   threat.  And second, I just wanted to make sure the Court is

22

1    aware.  The final category of documents we've requested -- we

2    spent a lot of time focused on the communications and bank

3    records and other documents, but there's also the issue of

4    retainer agreements with Wyndham owners.

5              THE COURT:  I'm going to get to that --

6              MR. BROWN:  Okay.

7              THE COURT:  -- once we wrap up this discussion.

8        So, Mr. Gallagher, I'm not going to order a forensic review

9    of your e-mail or phone at this point.  But as I'm sure you

10   know, the Plaintiffs are very thorough, and if it turns out that

11   there are documents --

12             MR. GALLAGHER:  Sure.

13             THE COURT:  -- that turn up in some other place that

14   you should have produced, there's not really going to be an

15   excuse at that point.

16             MR. GALLAGHER:  I understand.

17             THE COURT:  So I'm going to order you to go back and

18   to search your e-mail and your other communications, including

19   text messages, for responsive documents and to produce any

20   additional documents and communications that you find, with the

21   warning that if it appears that you did not conduct a thorough

22   search at some point later in this litigation, based on other

23   information that the Plaintiffs provide to me, I might order

24   that external review.

25             MR. GALLAGHER:  I understand, Your Honor.

1          THE COURT:  All right.  So then that brings us to the

2     next category with regard to the retainer agreements.  And I

3     understand Mr. Gallagher's response with regard to privilege,

4     but I'm not aware of any privilege that would cover retainer

5     agreements, Mr. Gallagher.

6          MR. GALLAGHER:  Well --

7          THE COURT:  Mr. Gallagher, I think you froze.  You

8     froze for a moment.  Can you say that again?

9          MR. GALLAGHER:  Yes, Your Honor.  Okay.  First of all,

10    Your Honor, a number of our clients have come to us simply for

11    advice with respect to Wyndham, and they have been afraid for

12    Wyndham to know that they have spoken with us because Wyndham's

13    tactics thus far are any time they realize that one of their

14    owners is represented by -- I assume by any counsel, but I know

15    by us, all of the sudden, instead of resolving the matter and

16    either adjusting ownership or terminating ownership or whatever

17    Wyndham ultimately is going to do, it generally changes from a

18    six-month process to a two- to three-year process simply because

19    Wyndham has chosen to show these people -- to teach them a

20    lesson for talking to attorneys.  And I'm not the one that

21    brought it to their attention.  They brought it to my attention,

22    Your Honor.  So a number of our clients have started out our

23    first conversation saying or asking the question, If we talk to

24    you, does Wyndham need to know?  And I have, I guess, possibly

25    and accurately advised them, No, anything we do between us is

1    privileged.  If you're simply asking me questions, if you're

2    asking how to approach this, whatever you're doing, Wyndham does

3    not have to know that you sought our counsel, unless we have to

4    do something affirmative on your behalf.  Wyndham punishes their

5    owners for talking with attorneys, Your Honor, and that's what

6    they're afraid of.

7                THE COURT:  Response from Plaintiffs.

8                MR. GALLAGHER:  In fact, Your Honor, if I may -- I'm

9    sorry.  For any client that we actually take on an active

10   representation, Wyndham has documentation.  We start every

11   representation with a letter to Wyndham saying, We represent

12   your owner so and so.  This is what their concern is.  These are

13   relevant facts.  Please let us know if we can discuss this

14   matter.  Every single one, Your Honor, has correspondence from

15   us.  I mean, just giving them a list, there's no purpose to the

16   list, other than they're going to punish people for talking with

17   us.  They've got -- they've got correspondence on every single

18   Wyndham client with whom I ever have spoken that we've taken up

19   their representation.

20               MR. BROWN:  Well, first of all, Your Honor, just in

21   response, we obviously dispute that characterization, and it's a

22   pretty bold accusation to say that our clients are somehow

23   vindictive towards people for retaining their own legal counsel,

24   and that's obviously not the case, and there's been no evidence

25   of any kind that's been submitted to that effect.

1    And I think, as the Court knows, retainer agreements are not

2  generally privileged.  I'm aware of maybe some circumstances

3  where there's, you know, issues of, you know, certain maybe

4  minors that are under duress or witnesses, et cetera, but this

5  is just, you know, routine individuals go to Mr. Gallagher, want

6  him to send a demand letter to our clients.  That's not any type

7  of circumstance that would justify an exception from the general

8  rule.  And so we think that these -- that these should be

9  produced, Your Honor.

10    THE COURT:  Mr. Gallagher, I'm not aware of a

11  privilege that would cover retainer agreements like this, and

12  if, as you said, you already sent letters to Wyndham upon

13  retaining a client, then I really don't see the harm in turning

14  over these retainer agreements either.

15    So I'm going to order them to be turned over, but if you do

16  believe that there's a basis in law that these agreements are

17  privileged, you can file a motion for protective order.

18  Otherwise, I am going to order that they be turned over.

19    Does that also cover the next subject, which is the

20  privilege log?

21    MR. BROWN:  It does, Your Honor, we just noted that we

22  hadn't been produced a privilege log or anything to that effect,

23  just that there was a blanket objection to privilege, which

24  actually this Court has already overruled in its prior order.

25  So we don't -- we think that your ruling covers that section as

26

1    well.

2           THE COURT:  I will say that if Mr. Gallagher does

3    believe that there's a basis in the law for privilege, you can

4    move for protective order, but you will also have to provide a

5    privilege log to the Plaintiffs prior to doing so, meet and

6    confer about that, and then I will -- in the motion for

7    protective order, you have to include the privilege log.  And I

8    have directions on my website as to my requirements for a

9    privilege log.

10          MR. GALLAGHER:  Well, Your Honor, I have a question

11   then for the Court.  If the client or potential client's fear is

12   they don't want Wyndham to know that they've conferred with

13   counsel because of how they at least believe Wyndham responds,

14   for us to do the privilege log, we would have to give up their

15   identity anyway, would we not, or can we list them as client A

16   client B and then say why we think that particular information

17   is privileged?

18          THE COURT:  If your belief is that the identifying

19   information for the client is privileged, then that would be

20   what you would seek to withhold, and you would have to describe

21   the document some other way.

22          MR. GALLAGHER:  Okay.

23          THE COURT:  Whether it's by a Bates number or what

24   have you, Bates number, you know, the date the agreement was

25   entered into, other identifying information, and then a

1  description of the privilege that you're asserting --

2          MR. GALLAGHER:  Okay.

3          THE COURT:  -- and the basis for that privilege.

4          MR. GALLAGHER:  Thank you.

5          THE COURT:  All right.  The owner list is the only

6  thing that I see left to discuss.  Mr. Brown.

7          MR. BROWN:  Which, Your Honor, the owner list

8  Mr. Gallagher said he was attempting to compile, but he didn't

9  have accurate information at the time, at least that's what his

10  response said.  We have never seen the owner list, which now I

11  guess I'm hearing an inconsistent answer that he doesn't want to

12  provide an owner list at all.

13      The owner list should either be found within the retainer

14  agreements that are produced, or we should obtain the actual

15  list, whether it's a spreadsheet or what have you.  But we have

16  not received that list.

17          THE COURT:  All right.  And, Mr. Gallagher, the issues

18  with the owner list, are they the same as those with the

19  retainer agreements or --

20          MR. GALLAGHER:  Yes, same issue, Your Honor, is

21  identifying clients who don't wish to be identified.

22          THE COURT:  All right.  Well, if you -- like I said,

23  if you can find a legal basis for that, feel free to file a

24  motion for a protective order.  Otherwise, you know, I don't

25  know -- if it's privileged, that's fine.  I am not aware of a

1    privilege that would cover that information.  It seems to fall

2    more under the -- more under the guise of, you know, protecting

3    these clients from any harassment or what have you.  At least in

4    the discovery process, that could be avoided by a

5    confidentiality agreement that had an attorney's eyes only

6    information provision, but at some point, if Plaintiffs want to

7    use this information, it may come out at trial or at some other

8    point in the process.  But for discovery purposes an AEO

9    provision might assuage any concerns that I have.  But if you

10   believe that information is privileged, then you can filed a

11   motion for a protective order setting forth the appropriate case

12   law in support for that.

13            MR. GALLAGHER:  Yes, Your Honor.

14            THE COURT:  All right.  Is there anything else?  I do

15   see the request for sanctions.  I think I previously ordered

16   attorney's fees against Mr. Gallagher for the prior motion.  As

17   to this motion, based on our discussion today and

18   Mr. Gallagher's responses, I'm not going to order attorney's

19   fees for this motion.  So I'll deny the motion to compel in that

20   regard, the request with regard to the sanctions issue.

21        There was also an issue that Mr. Gallagher raised as to

22   service, when certain documents are actually mailed to him.

23   Mr. Gallagher, can you explain that a little bit more?  I tried

24   to look at your attachments.  It wasn't exactly clearly to me

25   when the mailing occurred based on that.  It was very faint.  So

1  what was your contention there?

2          MR. GALLAGHER:  For this motion, Your Honor?

3          THE COURT:  I believe so.

4          MR. GALLAGHER:  Okay.  Well, Your Honor, I just didn't

5  want to be hit for sanctions again for not responding in a

6  timely manner.  And as I said, I apologize of the first time I

7  wasn't aware of the Court's standing order that I had something

8  like five days in which to respond.  But in this matter I saw

9  where the motion actually was filed.  I should have had those

10  dates right in front of me, but the motion was actually filed on

11  a particular date and then my service copy came something like

12  nine days later, which was my understanding that was outside the

13  five-day rule, and I didn't want to be hit for sanctions for not

14  responding in a timely manner.  So that's all I did.

15      The document you had difficulty reading, so did I, it simply

16  had the postal stamp on it, as far as the date when the

17  documents were sent to me, and they were sent to me well outside

18  the period in which I was allowed to respond.  So that was my

19  only reason for including that, Your Honor.  I just didn't want

20  to be hit with sanctions for an untimely response.

21          THE COURT:  I understand.  And going forward, I'll

22  keep in mind that these documents are being mailed to you.  I

23  believe you receive additional time for mailing.  So I'll keep

24  that in mind when calculating our internal deadlines and then

25  otherwise I'm sure Plaintiffs know they're under an obligation

1    to mail the documents when they say they're being mailed.

2            MR. GALLAGHER:  Thank you, Your Honor.

3            THE COURT:  Mr. Gallagher, I know you're receiving

4    things by mail.  I do note that there is an ability to receive

5    CM/ECF documents by e-mail, if that would be more expedient for

6    you.

7            MR. GALLAGHER:  Either way, Your Honor.  It's just

8    I've been sitting out COVID.  In the last several months, I've

9    had -- as Mr. Quinn knows, I've had three surgeries and a wicked

10   case of COVID, worse case I've personally known anybody to have.

11   And so I've been recuperating down at my home here in Florida at

12   the beach, and I've come to learn that the postal service here

13   at the beach really leaves something to strive for.  So I'm more

14   than happy to receive documents any way I can.  It's just I do

15   sometimes get a little bit nervous when they're trusted to the

16   post office.  But I guess I can always address that.  If I

17   honestly have not received something, I'll just have to let the

18   Court know.  And if I do receive it late --

19       For example, in this case with this motion, it wasn't the

20   post office's fault.  I mean, the meter stamp was something

21   like -- something ridiculous, like 9 or 10 days after the --

22   after the documents were dated.  So I couldn't blame the postal

23   service.  By I do have to admit the postal service here at the

24   beach does make me a little bit nervous.  Thus far, though, I

25   haven't -- I haven't known to experience a real problem with

31

1    them, but it is something I've got to keep cognizant of.

2           THE COURT:  All right.  Well, if you would like to

3    receive CM/ECF notifications by e-mail, contact -- let's see,

4    what would be the best way to do that?  You can contact my

5    courtroom deputy with your e-mail address.  And I'll just go

6    ahead and order the clerk's office to allow you to receive

7    CM/ECF communications.  You won't be able to file anything on

8    CM/ECF, but you'll at least get notifications of when things are

9    filed.  To file things, you'll still have to mail them in.  I

10   think the clerk's office might still be using the e-mail system

11   drop box right now.

12          MR. GALLAGHER:  Thank you.

13          THE COURT:  Regardless, you would at least get those

14   notifications.  So contact my courtroom deputy, and she'll take

15   down your e-mail address, and then we'll include an order

16   allowing that.

17      Is there anything else to take up from the Plaintiffs'

18   perspective?

19          MR. QUINN:  Not at this time, Your Honor.

20          THE COURT:  Okay.

21          MR. BROWN:  Your Honor, real quick, just in terms of

22   the timing of some of the things that have been --

23          THE COURT:  That's a good point.

24          MR. BROWN:  -- compelled.  And I would to -- forgive

25   my take on it.  The issue we have is we're trying to set

1    Mr. Gallagher's -- the 30(b)(6) deposition for May 5th.  It was

2    supposed to be last week.  We've had issues serving

3    Mr. Gallagher.  I believe Mr. Gallagher told us last week that

4    he was served in the grocery store or something like that for

5    the last subpoena.  I'd like to avoid -- since he is a named

6    party in the case, I would like to avoid having to expend

7    additional costs to continually -- we made a decision not to try

8    to move to compel the attendance based upon the issues we had

9    last time we tried to set the deposition.

10       But my point is, we're trying to set this for May 5th;

11   therefore, if Mr. Gallagher will agree to appear on May 5th, we

12   would ask that his amended responses be produced a few days in

13   advance of that deposition date.

14         THE COURT:  All right.  Mr. Gallagher, can you, I

15   guess, A, agree to appear on May 5th and then, B, can you

16   produce any additional responsive documents by the end of the

17   month, we'll say April 30th?

18         MR. GALLAGHER:  Your Honor, I certainly will try, but

19   some of them, for example the bank records, I'm at -- you know,

20   I'm at the mercy of the bank, Your Honor.  You know, some of

21   these documents that I have to depend upon third parties I may

22   be -- like the bank comes to mind.  If the bank can get them to

23   me in a few days, they can have them in a few days.  I guess I

24   can let the Court know if there is an issue with getting these

25   documents from third parties in time.

1          THE COURT:  Sure.  So what I'll say is, I think you

2    said you can make the request to the bank today.  So go ahead

3    and do that.  And then if by early next week it looks like the

4    bank is not going to -- or any of the other providers are not

5    going to be able to get you the documents in time, then just

6    file a motion for an extension of time, and I'll take that up

7    then.

8          MR. GALLAGHER:  Your Honor, while Mr. Quinn is on

9    here, I wonder -- because I'm supposed to be moving my house

10   later this week, I would just like to throw out there.  I was

11   wondering if Plaintiff would consider, especially because this

12   basically is going to be my third time being deposed by them --

13   first time we just did it through a declaration.  The second

14   time was a deposition.  Third time they're saying there were

15   issues, but the issues was it was an office suites location.

16   Regis Office Suites with 65 offices, and they did not list the

17   attorney's name.  And the receptionist was calling every

18   attorney she knew in there while I was standing there, and she

19   couldn't find anybody who wanted to talk to me.  And then I sat

20   around for another 30 minutes in their lobby, and nobody came to

21   look for me.  But in any event, that's neither here nor there.

22   I'm wondering if Plaintiffs would consider just pushing it back

23   a few more days to allow for me to get some of these documents

24   while I'm in the process of moving my home and especially since

25   there's no hearing or trial scheduled.

34

1      THE COURT:  What date would you propose?

2      MR. GALLAGHER:  Well, any additional days past the 5th

3  would be helpful, particularly, as I said, in light of the fact

4  that I'm going to try -- again, Your Honor, I'm going to give it

5  the old college try getting them whatever documents they want,

6  and I also have to move.  And so if they want to keep it on that

7  date, that's fine, I'll be there, but I was hoping since no

8  hearings or trials or anything are scheduled, they might see fit

9  to give me an additional five days or a week, something like

10  that.

11      MR. BROWN:  Yeah.  We have no issue giving him

12  additional time.  There's also another attorney representing

13  another party that would need to be coordinated with.  Your

14  Honor, we would ask that the order reflect that Mr. Gallagher

15  agrees to make -- to produce himself by May 14th.

16      MR. GALLAGHER:  Sure.

17      THE COURT:  All right.  So by May 14th and then the

18  documents I will say by May 7th.

19      MR. GALLAGHER:  Okay.

20      THE COURT:  All right.  Is there anything else from

21  Plaintiffs' perspective?

22      MR. BROWN:  No, Your Honor.  Thank you.

23      THE COURT:  From you, Mr. Gallagher?

24      MR. GALLAGHER:  No, Your Honor.  Thank you very much.

25      THE COURT:  All right.  Have a good afternoon,

35

1    everyone.  This hearing is adjourned.

2            MR. GALLAGHER:  Thank you, sir.

3        (WHEREUPON, this matter was concluded at 2:19 p.m.)

4                          *   *   *

5                    CERTIFICATE OF REPORTER

6

     I certify that the foregoing is a correct transcript of the
7    record of proceedings in the above-entitled matter.

8
      /s/ Suzanne L. Trimble_____          5/5/21
9     Suzanne L. Trimble, CCR, CRR, RPR           Date
      Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25